UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SKY UK LTD., SKY ITALIA S.R.L., AND
SKY DEUTSCHLAND FERNSEHEN GMBH
& CO. KG,

                       Plaintiffs,

         v.

WARNERMEDIA DIRECT, LLC,

                       Defendant.

Civil Action No. _____

## COMPLAINT

Plaintiffs Sky UK Ltd. ("Sky UK"), Sky Italia S.r.l. ("Sky IT"), and Sky Deutschland

Fernsehen GmbH & Co. KG ("Sky DE," and collectively with Sky UK and Sky IT, "Sky"), by

and through their undersigned attorneys, allege against defendant WarnerMedia Direct, LLC

("Warner") as follows:

## NATURE OF THE ACTION

1.      Sky brings this action seeking damages and specific performance to redress

Warner's multiple material breaches of a 2019 agreement regarding the co-funding and co-

production of exclusive premium television shows for Sky viewers.  As set forth further below,

Warner has repeatedly failed to offer Sky the annually required minimum number of

contractually qualifying series for its consideration.  Specifically, Warner was obligated to

present Sky with at least four shows per year across 2021, 2022, and 2023 but undisputedly fell

far short of that mark, in certain years offering barely a *single* qualifying series while also

withholding critical, contractually required information necessary for Sky to evaluate any

potential options that it did receive.  This misconduct has deprived Sky of its bargained-for opportunity to co-fund, co-produce, and subsequently exploit exclusively in U.K. and European territories all manner of top-end Warner content.  If all that were not enough, Warner has now even brazenly denied Sky its right to partner on Warner's highly valuable decade-long, tentpole television series adapting J.K. Rowling's iconic *Harry Potter* novels, set to premiere in 2026 or 2027.  Instead, Warner has largely disregarded the parties' agreement and sought to keep the *Harry Potter* content for itself so that Warner can use it as the cornerstone of the launch of its Max streaming service in Europe.

2.    Sky and Warner are parties to a valid, binding contract, dated September 20, 2019, by which Warner is required to annually offer Sky certain original content from HBO Max ("HBO Max," or, as since rebranded, "Max") for Sky's consideration as co-funding and co-production opportunities (the "Co-Funding Agreement").  Among other things, the Co-Funding Agreement obligates Warner to offer "all . . . (and not less than four (4) in any event)" Max original series meeting certain contractually specified qualifications to Sky during every calendar year from 2021 to 2025, each of which Sky would have the option to co-fund and co-produce. Each co-funding candidate must be "formally submitted" to Sky executives as soon as Max "is prepared to order a first season" and must include "all relevant information related to the Series," as soon as such information is "available," to enable Sky to make a decision on which series to co-fund and co-produce.  Sky is required under the Co-Funding Agreement to select from among the qualifying offers at least two series per year but has complete discretion to pick any two from the slate and is entitled, at its sole option, to select any number of series beyond that contractual minimum.

3.     The Co-Funding Agreement further provides that Warner shall assign to Sky "all media rights" for each selected series in the geographic territory covered by the contract, which includes the U.K. and multiple countries in Europe, for a period of twenty years from delivery of the last episode of each season in any given series.  Sky is entitled to "retain all revenue generated from exploitation of [these media rights]."

4.     Warner has never upheld its end of the parties' bargain.  Despite claiming, at least during the initial years of the Co-Funding Agreement's term, that it had dozens of potentially qualifying series in development, Warner undisputedly failed to offer Sky the required minimum four qualifying series during each calendar year from 2021 through 2023 (i.e., Year 1 through Year 3 of the contractual term).  To the extent Warner formally offered Sky *any* purportedly qualifying series during that timeframe, it failed to timely provide—or wrongfully withheld altogether—critical, contractually required information about the series in question necessary for Sky to confirm that it in fact qualified under the Co-Funding Agreement or meaningfully evaluate the series' appeal as a co-funding opportunity.

5.     Sky has frequently learned more about potentially qualifying series from public information and Warner's own press releases than from anything Warner has shared with Sky under the Co-Funding Agreement.  Warner's conduct in disclosing key series details to the public without disclosing them to Sky violates Warner's obligations under the Co-Funding Agreement and substantially deprives Sky of the contractual benefits for which it bargained.

6.     Warner's actions have made it manifestly clear that: (i) Warner has no intention of ordering the four qualifying series per year that it committed to offer Sky; (ii) Warner intends to keep solely for itself any potentially lucrative qualifying series that it *does* order in an effort to boost the performance of its own Max streaming service in Sky's contractual territories as a

direct competitor to Sky; or (iii) some combination of the two.  In all events, Warner has reneged, and continues to renege, on the promises it made to Sky.

7.      Warner's gambit reached new heights on April 12, 2023.  On that day, Warner's parent company (Warner Bros. Discovery Inc. ("WBD")) issued a press release announcing that Max had officially "ordered" the above-referenced "decade-long" *Harry Potter* series (the "*Harry Potter* Series"), to be executive produced by Ms. Rowling herself, which would "faithful[lly] adapt[]" and "dive deep" into each original "iconic" novel and help propel the *Harry Potter* "cultural phenomenon" toward a "new generation of fandom."

8.      As alleged herein, the *Harry Potter* Series plainly meets all of the criteria for a qualifying series under the Co-Funding Agreement: one hour in length per episode, intended to be multi-season, produced by Warner Bros. Television for premiere on Max, and, by Warner's own account, "ordered" in 2023.  Warner, however, did not (and continues to refuse to) submit the Series for Sky's consideration in accordance with the contractual terms.  At the same time, WBD executives have publicly touted the *Harry Potter* Series as critical to the company's ongoing efforts to "build[] Max" into a "profitable" streaming service, especially in its "rollout" to "key international regions and markets," including many or all of the very U.K. and European markets in which Sky would have exclusive exploitation rights under the Co-Funding Agreement.  In short, Warner seeks to deprive Sky of the valuable contractual benefits for which Sky bargained specifically in order to expand the market share of Warner's own streaming service in Sky's territories.

9.      Further, in response to Sky's queries about the opportunity to co-fund the *Harry Potter* Series as clearly contemplated by the Co-Funding Agreement, Warner made clear that it had no intention of ever offering Sky the Series in accordance with the contractual terms.

Indeed, in one May 13, 2023 email, Warner stated (without explanation or substantiation) that "the actual circumstances of production preclude HBO Max from ever presenting Sky with four series in one year," "performance by HBO Max is impossible and accordingly . . . the deal is unenforceable" and "inoperative." In other words, more than three years after signing the Co-Funding Agreement, Warner suddenly claimed with no viable justification that the parties effectively had no binding contract and Warner would repudiate many, if not all, of its obligations going forward.

10.     Meanwhile, WBD's CEO has continued to repeatedly emphasize the company's "excitement" to broadcast "a decade of new [*Harry Potter*] stories with fans around the world," to hold up the *Harry Potter* Series as "one of the big differentiators of [the] company," and to candidly admit to investors that removing properties like the *Harry Potter* Series from its lineup would leave the performance of the company's studio division "relatively flat." Indeed, in its Q1 2024 earnings disclosures, WBD announced that this division had suffered a year-over-year decline of more than $400 million in Adjusted EBITDA (70% ex-FX), specifically citing "a very tough comp" against Q1 2023, which had seen the "great performance of Hogwarts Legacy"—a *Harry Potter*-based video game first released in February 2023.

11.     Rights to the *Harry Potter* Series constitute a potentially transformational asset for which no reasonable substitute is available. Based on a franchise with well-established, enduring, and incomparably enthusiastic appeal for hundreds of millions—if not billions—of readers, viewers, and all manner of other devotees since the first novel's publication more than twenty-five years ago, the Series is widely expected to propagate what is already an unparalleled cultural phenomenon into a whole new generation. Any company that the *Harry Potter* Series called home would undoubtedly reap untold benefits not solely in terms of the extraordinary

concrete revenues and average revenue per user ("ARPU") expected to flow from its exploitation but also goodwill, brand accretion, reputational enhancement, and competitive market standing.

12.     Sky has incurred, and will continue to incur, significant injuries as a result of Warner's actions.  The loss of the opportunity to partner in the funding and production of the wholly unique and irreplaceable *Harry Potter* Series cannot be completely or adequately quantified, including, without limitation, due to the substantially non-quantifiable harms to Sky's goodwill, brand, reputation, engagement, and competitive market standing.  However, Sky faces, at the very least, hundreds of millions of dollars' worth of lost revenue that it would have generated through exclusive exploitation of co-funded series were it not for Warner's breaches.

13.     Sky has not sat idly on its rights.  As alleged herein, since Warner's first breach of the Co-Funding Agreement in 2021, Sky has sought to work cooperatively with Warner to try to find an amicable resolution, including by exploring whether a potential amendment to the Co-Funding Agreement was possible.  Ultimately, all of those efforts failed, and Warner's recent conduct has made clear there is little reason to expect progress going forward.  Indeed, in just the latest demonstration of its total disregard for Sky's rights, Warner on September 8, 2024 launched a casting call for the three lead acting roles in the *Harry Potter* Series, with contemporaneous press reports noting a possible target production start date in April 2025. Warner has not invited Sky to participate in these activities in any way.

14.     It is clear that Sky can wait no longer wait for Warner to remediate breaches of an Agreement that it plainly has no intention of honoring.  Through this action, Sky now seeks redress for substantial injuries.

## THE PARTIES

15.     Plaintiff Sky UK is a private limited company organized under the laws of England and Wales, with its principal place of business at Grant Way, Isleworth, Middlesex TW7 5QD, United Kingdom.  Sky UK is a wholly owned subsidiary of Sky Limited, a private limited company organized under the laws of England and Wales, with its principal place of business at Grant Way, Isleworth, Middlesex TW7 5QD, United Kingdom.  Sky Limited is a wholly owned subsidiary of Comcast Bidco Limited, a private limited company organized under the laws of England and Wales, with its principal place of business at Grant Way, Isleworth, Middlesex TW7 5QD, United Kingdom.  Comcast Bidco Limited is a wholly owned subsidiary of Comcast Bidco Holdings Limited, a private limited company organized under the laws of England and Wales, with its principal place of business at Grant Way, Isleworth, Middlesex TW7 5QD, United Kingdom.  Comcast Bidco Holdings Limited is a wholly owned subsidiary of Comcast Corporation, a publicly traded corporation organized under the laws of Pennsylvania, with its principal place of business at One Comcast Center, Philadelphia, PA 19103.

16.     Plaintiff Sky IT is a *società a responsabilità limitata* organized under the laws of the Republic of Italy, with its principal place of business at Via Monte Penice 7, 20138 Milan, Italy.  Sky IT is a wholly owned subsidiary of Sky Italian Holdings SpA, a *società per azioni* organized under the laws of the Republic of Italy, with its principal place of business at Via Monte Penice 7, 20138 Milan, Italy.  Sky Italian Holdings SpA is a wholly owned subsidiary of Sky International Operations Limited, a private limited company organized under the laws of England and Wales, with its principal place of business at Grant Way, Isleworth, Middlesex TW7 5QD, United Kingdom.  Sky International Operations Limited is a wholly owned subsidiary of Plaintiff Sky UK.

17.    Plaintiff Sky DE is a *Gesellschaft mit beschränkter Haftung* organized under the laws of the Federal Republic of Germany, with its principal place of business at Medienallee 26, 85774 Unterföhring, Germany.  Sky DE is a wholly owned subsidiary of Sky German Holdings GmbH, a *Gesellschaft mit beschränkter Haftung* organized under the laws of the Federal Republic of Germany, with its principal place of business at Medienallee 26, 85774 Unterföhring, Germany.  Sky German Holdings GmbH is a wholly owned subsidiary of Sky International Operations Limited.  Sky International Operations Limited is a wholly owned subsidiary of Plaintiff Sky UK.

18.    All three Plaintiffs are part of Sky Group, a British media and telecommunications company that operates, together with Comcast Corporation and its other subsidiaries, as part of the Comcast Group.  Sky Group is one of Europe's leading providers of pay television broadcasting and home communications services.  Among other things, it runs several popular linear satellite television channels, operates a set-top box-based multimedia and entertainment service platform (Sky Q), offers a satellite dish-free streaming service launched in 2022 (Sky Stream), manufactures and markets smart television devices (Sky Glass), and maintains a studio operation that commissions scripts for original content and works to develop and produce the projects in-house (Sky Studios).

19.    Defendant Warner is a limited liability company organized under the laws of Delaware and authorized to do business in New York, with its principal place of business at 30 Hudson Yards, New York, NY 10001.  Upon information and belief, WM Max, LLC ("WM Max") is the sole member of Warner.

20.    Upon information and belief, WM Max is a limited liability company organized under the laws of Delaware, with its principal place of business at 30 Hudson Yards, New York,

NY 10001.  Upon information and belief, WM Max has four members: (i) WM Max Holdings, LLC; (ii) WM Interactive Media Holdings, LLC; (iii) Turner Broadcasting System, Inc.; and (iv) WM Max Holdings II, LLC.

21.     Upon information and belief, WM Max Holdings LLC is a limited liability company organized under the laws of Delaware, with its principal place of business at 30 Hudson Yards, New York, NY 10001.  Upon information and belief, WBD is the sole member of WM Max Holdings LLC.  WBD is a publicly traded media and entertainment corporation organized under the laws of Delaware with its principal place of business at 230 Park Avenue South, New York, NY 10001.  WBD's brands and products include, but are not limited to, Max—a subscription-based video-on-demand streaming platform—and Warner Bros. Television ("WBTV").  WBD both produces and develops original programming through its network of brands and franchises and licenses content from third-party studios and producers.  As relevant here, Defendant Warner is the operator of Max, which primarily distributes film and television content licensed by Warner, whether from other WBD entities or third parties.

22.     Upon information and belief, WM Interactive Media Holdings, LLC is a limited liability company organized under the laws of Delaware with its principal place of business at 30 Hudson Yards, New York, NY 10001.  Upon information and belief, Historic TW Inc. is the sole member of WM Interactive Media Holdings, LLC.  Upon information and belief, Historic TW Inc. is a corporation organized under the laws of Delaware with its principal place of business at 30 Hudson Yards, New York, NY 10001.

23.     Upon information and belief, Turner Broadcasting System, Inc. is a corporation organized under the laws of Delaware with its principal place of business at 30 Hudson Yards, New York, NY 10001.

24.     Upon information and belief, WM Max Holdings II, LLC is a limited liability company organized under the laws of Delaware with its principal place of business at 30 Hudson Yards, New York, NY 10001.  Upon information and belief, WM Columbus Holdings, Inc. is the sole member of WM Max Holdings II, LLC.  Upon information and belief, WM Columbus Holdings, Inc. is a corporation organized under the laws of Delaware with its principal place of business at 30 Hudson Yards, New York, NY 10001.

## JURISDICTION AND VENUE

25.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

26.     This Court has personal jurisdiction over Warner pursuant to Fed. R. Civ. P. 4(k)(1)(A) and N.Y. C.P.L.R. §§ 301 and 302 because Warner's principal place of business is located in the State of New York and Warner regularly conducts and transacts business in New York, including the transactions giving rise in substantial part to the claims asserted herein.

27.     In addition, this Court has personal jurisdiction over Warner pursuant to the parties' consent by contract.  Warner expressly consented in the Co-Funding Agreement "to submit to [the] exclusive jurisdiction of the state or federal courts sitting in New York County, New York in connection with any dispute arising out of this Agreement."

28.     Venue in this judicial district is proper under 28 U.S.C. § 1391 because Warner has its principal place of business, and otherwise resides, within this district, and a substantial part of the events giving rise to the claims asserted herein occurred within this district.

## SUBSTANTIVE ALLEGATIONS

### Sky and Warner Enter into the Co-Funding Agreement to
### Co-Fund and Co-Produce Original Max Series

29.     On or about September 20, 2019, Sky and Warner entered into the Co-Funding Agreement, which provides that it "constitutes a binding agreement between the parties" to be "construed under the laws of the State of New York." A copy of the Co-Funding Agreement is attached hereto as **Exhibit A**.

30.     The Co-Funding Agreement was conceived against the backdrop of the parties' renewal negotiations with respect to the broader output and licensing agreement that had historically allowed Sky to distribute Warner's and its affiliates' content on Sky platforms. It was designed specifically to protect Sky against the possibility that Warner—which was already developing a plan to roll out HBO Max in Europe—ever sought to allocate its highest quality and most desirable series to its own streaming service, thereby circumventing Sky entirely and denying it access to valuable content.

31.     Under Section 3(a) of the Co-Funding Agreement, Warner expressly agreed to present to Sky for each year from 2021 to 2025 "*all* qualifying HBO MAX original series (*and not less than (4) in any event*)" that are:

    a.   "one hour slot length in duration per episode";

    b.   "intended to be multi-season";

    c.   "produced by WBTV or HBO Max for premiere on HBO Max"; and

    d.   "ordered within the applicable year to a first season (each a 'Series')."

(emphasis and underscoring added).

32.     Assuming these conditions are satisfied, Section 5 of the Co-Funding Agreement requires Sky to select at least two qualifying Max original Series per year from 2021 to 2025 for

co-funding and co-production with Warner and to provide funding in the aggregate up to a contractually specified "Minimum Annual Commitment" for each year.  There is no limit on the number of Series that Sky may elect to co-fund beyond these minimum requirements.

33.    Pursuant to Section 7 of the Co-Funding Agreement, for each Series that Sky selects (each, a "<u>Selected Series</u>"), Sky receives "[a]n assignment of all media rights" for that Selected Series, "including Linear TV, Pay TV, streaming, home entertainment and sub-distribution" rights to the Selected Series within a contractually specified geographical territory (the "<u>Sky Territory</u>") for a period of twenty years from the date of the delivery of the last episode of each season of each Selected Series (collectively, the "<u>Sky Rights</u>").  The Sky Territory covers several regions of Europe, including the U.K., Italy, and Germany.

34.    Sections 5 and 6 of the Co-Funding Agreement together obligate Sky to co-fund each Selected Series for at least five seasons, each at a fixed percentage allocation between 20% and 25% determined based on the Selected Series' budget for Season 1.  Critically, moreover, the Agreement also provides Sky, at its exclusive option, with extremely valuable so-called life-of-series rights: i.e., the right to continue co-funding any Selected Series for "each subsequent season" that may be "ordered by HBO Max" beyond a Season 5.  Sky may do so "at the same percentage allocation" and "under the same terms of this Agreement."  Because, as explained above, the Sky Rights are exclusive to Sky in the Sky Territory for twenty years from delivery of the final episode of each season of each Selected Series, if Sky were to co-fund a Selected Series for a complete life of, for example, ten seasons, it would hold Sky Rights pertaining to that Series for at least thirty years.

35.    The Co-Funding Agreement unqualifiedly provides in Section 7(b) that "Sky shall retain all revenue generated from exploitation for the Sky Rights."

36.     Importantly, Sky's role for each Selected Series goes well beyond funding.  The Co-Funding Agreement contemplates a creative collaboration between Sky and Warner designed to ensure that any successful Selected Series would contribute to Sky's goodwill, brand accretion, reputational enhancement, and competitive market standing.  Specifically, Warner is required under Section 5(d) to "meaningfully consult with Sky" regarding key creative aspects of each Selected Series.  These include, but are not limited to, scripts, editing, reshoots, writers, showrunner, executive producers, producers, series regulars, and recurring cast.

37.     In addition, Section 11 of the Agreement affords Sky certain credit rights for each Selected Series.  Among other things, Sky is entitled to include the phrase "Sky Studios presents" as the sole credit before the title of a Selected Series for broadcasts in the Sky Territory and a "Sky Original" credit or "bumper" before and after the opening and closing titles of each episode of a Selected Series within the Sky Territory.  Sky is also entitled to have an "in association with Sky Studios" credit placed "adjacent to the [Warner] credit" in the geographic territories allocated to Warner.  The ability to specifically brand Selected Series as Sky productions and to receive credit as a partner involved in a project, even in the Warner territories, are valuable rights for Sky under the Co-Funding Agreement.

38.     Still further, Section 12 of the Co-Funding Agreement requires Warner to make available to Sky any "advertising and other promotional materials" to which it has reasonable access and to "use reasonable good faith efforts to make principal actors and other key talent associated with any Selected Series available to Sky in order to promote and publicize such Selected Series in the territories under the Sky Rights" (all subject to availability of the talent but at no additional non-travel costs to Sky).

39.     In order to ensure compliance with Warner's obligation to present *all* qualifying Series to Sky in a timely manner and to facilitate Sky's ability to select the minimum two Series from among the current and prospective offers Warner is required to make over the course of each year, Section 3(c) of the Co-Funding Agreement requires Warner to provide a "bi-monthly report in writing" to Sky UK executives that lists the "current HBO MAX slate of qualifying projects," including relevant detail on the status and future prospects for each project (the "Bi-Monthly Reports").

40.     Separate from and in addition to these Bi-Monthly Reports, Warner must "formally submit[]" each purportedly qualifying Series to Sky UK Executives for consideration under Section 4 of the Co-Funding Agreement as soon as "HBO MAX is prepared to order a first season" for any such Series.  The Co-Funding Agreement provides that Warner's submissions for "Year 1" of the Co-Funding Agreement will be comprised of those Series that are "ordered to an initial season by HBO MAX in the US" in the year 2021.  The same system applies for each subsequent year: submissions for Year 2 are limited to Series ordered in 2022; submissions for Year 3 are limited to Series ordered in 2023; submissions for Year 4 are limited to Series ordered in 2024; and submissions for Year 5 are limited to Series ordered in 2025.  Submission to Sky in the same year that a Series is "ordered" by Warner is a specifically bargained-for requirement critical to vindicating Sky's above-discussed rights to partner in the creative development of each Selected Series.

41.     To reinforce Warner's obligation to make formal submissions to Sky of all information that is relevant to Sky's funding decisions, Section 4(b) of the Co-Funding Agreement states that "Sky shall be provided" with certain information "then available" with each formal submission (the "Submission Materials").  The Submission Materials include, but

are not limited to, "*all relevant information related to the Series*, including underlying properties on which the Series is based, scripts, names of key creative elements and whether proposed or attached (e.g., director(s), principal cast, writer(s), producer(s)), proposed series budget and schedule, details of development costs incurred by [Warner] to date and included in the series budget, series payment milestones, pilot (if applicable), and access to HBO MAX creative and business executives for further discussion."  (emphasis added).

42.     Under Section 4(c) of the Co-Funding Agreement, once Sky receives the Submission Materials from Warner, Sky has thirty business days to notify Warner whether Sky elects to co-fund the Series.  Only if Sky declines to select a Series within the thirty-business day timeframe is Warner permitted to "sell" the Series "elsewhere."  Moreover, if Warner makes its formal submission to Sky before "all main leads and first episode director" are confirmed for the Selected Series, then Sky has an additional five business days from the date of confirmation of these matters to consider whether to select the Series, provided that the Sky Rights are still available at the time of confirmation.

43.     In addition, Section 4(c) expressly grants Sky an option to select a Series "retroactively" at any point "within the applicable Term year," provided that the Sky Rights are still available.

44.     In sum, the Co-Funding Agreement confers a unique array of valuable benefits on Sky in exchange for Sky's substantial, long-term commitment of funds to Selected Series.  That, of course, includes decades' worth of revenues expected to flow from exclusive exploitation of the Sky Rights.  But it also includes the highly unique opportunities to: (i) have editorial and creative input into the Selected Series themselves (allowing Sky, among other things, to push for casting of local talent likely to drive increased buy-in from audiences in the Sky Territory);

(ii) otherwise materially co-own the Selected Series development and exhibition process from inception (including through branding, crediting, and promotional activities); and (iii) maintain advanced visibility into Sky's potential suite of offerings years down the road—a critical strategic planning advantage.

45.    The Agreement also gives Sky access to content likely to be of unique popularity, as prior Warner series that would have qualified under the contract have on the whole performed extremely well, with many lasting several seasons and attracting significant viewership in a manner that would have made them highly valuable for advertisers.  Thus, by entering into the Agreement and committing co-production funds in its long-range planning each year in exchange for exclusive rights in the Sky Territory to tentpole original Series, Sky stood to reap substantial and difficult-to-replicate subscriber gains, increased ARPU, deeper engagement, and enhanced subscriber loyalty—all with resulting positive financial impact as well as increased advertising revenue.

**Warner Fails to Present Four Qualifying Series to Sky in Year 1 (2021)**

46.    In Year 1 of the Co-Funding Agreement (2021), Sky stood ready to consider and select qualifying Series, but Warner undisputedly failed to submit the minimum four qualifying Series to Sky.

47.    Indeed, over the course of Year 1, Warner only provided Sky with a total of two Bi-Monthly Reports required under the contract, and even these were seriously wanting. Specifically, Laura Forti, SVP, Business Operations at Warner ("Forti"), emailed Sky with spreadsheets containing minimal details regarding various projects that, upon information and belief, corresponded to projects that were then in development by Warner (each, a "Sky Report").

48.     Notwithstanding the requirement under the Co-Funding Agreement that each Bi-Monthly Report list Warner's "slate of qualifying projects," these Sky Reports and related correspondence from Forti in Year 1 failed to identify anything close to the requisite four qualifying Series for Year 1.  To the extent Warner presented Sky with *any* Series meeting all of the contractual criteria, it was often difficult or impossible for Sky to definitively confirm as much given the sparse information about the projects that Warner provided.

49.     On or about September 20, 2021, Sky and Warner held a call to discuss Warner's failure to date to submit four qualifying Series for Year 1.  In order to potentially help facilitate Warner's contractual performance going forward, the parties discussed possible modifications to the Co-Funding Agreement that would have broadened the scope of qualifying Series, such as including projects that were "ordered" prior to 2021, including "limited series," and including series with a per-episode duration of less than one hour, among other options.  The parties did not reach agreement upon any modifications, however, and made no modifications to the Co-Funding Agreement.

50.     For more than two months, Warner failed to take any further action to comply with its obligations under the Co-Funding Agreement.  No doubt aware that it was already in material breach, Warner hastily made three non-qualifying purported submissions to Sky in the final weeks of Year 1.  These last-minute series submissions failed to include "all relevant information related to" each project, and, upon information and belief, were not timely presented to Sky as soon as such information became available to Warner, in further breach of Warner's obligations.

51.     On November 29, 2021, Sky held a call with Robert Blair, President, Warner Bros. International Television Distribution ("Blair") to again discuss Sky's concerns regarding

Warner's failure to submit four qualifying Series under the Co-Funding Agreement in Year 1. As reflected in an email from Sky to Blair on December 21, 2021 memorializing the issues discussed on the parties' call, Blair expressly acknowledged the validity of the Co-Funding Agreement and that Warner had failed to meet its contractual obligations thereunder. Blair also agreed with Sky that because Warner had failed to present four qualifying Series, Sky "has no financial commitment for 2021" under the Co-Funding Agreement.

52.     Despite Warner's material breach of the Co-Funding Agreement, Sky elected not to terminate the Agreement in view of Sky's long commercial relationship with Warner and Blair's assurances that Warner intended to comply with its obligations for Year 2. Accordingly, in its December 21 email, Sky reiterated that Warner should have—and, going forward, must— submit a minimum of four qualifying Series per year per the contractual requirements: "As discussed, Sky remains committed to the deal for 2022 and we look forward to receiving submission materials for a minimum of four qualifying series next year."

53.     Sky also insisted that Warner maintain a "regular dialogue" regarding qualifying projects in Year 2, particularly in light of Warner's failure to submit the full required set of Bi-Monthly Reports. Regarding the formal submission process, Sky noted that any Submission Materials from Warner must be submitted to Sky "early" in the development process for a qualifying Series, and in any event "soon after HBO Max has ordered to series," as provided in the Co-Funding Agreement. Sky quoted verbatim Section 4(b) of the Co-Funding Agreement to emphasize the specific information that must be included within the Submission Materials.

54.     Warner and Sky again discussed the possibility—originally discussed with Forti—of modifying the Co-Funding Agreement to include a broader scope of projects. In its December 21 email, Sky indicated that it was "open to a conversation to widen the criteria for

qualifying series to include limited series for the remainder of the term," if that would help to ensure Warner's performance under the contract. However, the parties did not agree upon or execute any modification of the Co-Funding Agreement.

55.     On December 22, 2021, Blair responded to Sky, stating in part: "Give us a couple of weeks to circulate internally and we'll return with our comments in the New Year" on potentially qualifying Series. Warner did not respond further with comments in 2022.

### Warner Fails to Present Four Qualifying Series to Sky in Year 2 (2022)

56.     In Year 2 of the Co-Funding Agreement (2022), Sky stood ready to consider and select qualifying Series, but Warner once again failed to submit four qualifying Series to Sky.

57.     Despite Blair's assurances, Warner submitted a total of only three purported Bi-Monthly Reports for the entirety of Year 2. As in Year 1, these purported Bi-Monthly Reports plainly failed to identify at least four Series qualifying under the Co-Funding Agreement, and because of the limited information provided, it was often difficult or impossible for Sky to confirm that *any* given Series actually met the contractual criteria, as discussed further below.

58.     On March 10, 2022, Sky arranged a call with Forti to address the status of Warner's submissions for Year 2. On the same day, Forti emailed Sky "a list of what's currently on our drama slate, produced by WBTV or [HBO] Max in-house." Forti attached a spreadsheet to her email entitled "Drama Report" ("March 10 Drama Report") that substantially resembled the above-referenced—and insufficient—Sky Reports. The March 10 Drama Report listed sixty titles. Forty of the listed titles bore the comment, "No Production Order," making expressly clear that they were not then qualifying Series under the Co-Funding Agreement.

59.     Eight of the listed titles bore the comment: "Development – Ordered Series." These included: *Penguin*; *Subject to Change*; *Constantine*; *Full Circle*; *Girls on the Bus*; *Green Lantern*; *IT: Welcome to Derry*; and *Peacemaker*. However, at least five of the eight titles listed

as "Ordered Series" were also clearly not qualifying Series under the Co-Funding Agreement. For example, *Penguin* and *Full Circle* were listed as "limited series," which do not qualify as a "Series" per Section 3(b) of the Co-Funding Agreement.  In addition, Warner had previously indicated to Sky that at least *Subject to Change*, *IT: Welcome to Derry*, and *Peacemaker* were "ordered" prior to 2022, rendering them ineligible under the above-discussed contractual requirement that submissions for each Year "will be comprised of those [Series] ordered to an initial season by HBO MAX in the US" in that same Year.

60.    Neither Forti's email nor the March 10 Drama Report clarified whether at least two of the remaining titles, *Constantine* and *Green Lantern*, were purportedly qualifying Series. And Forti's email also failed to include documents regarding the finances or budget for any of the titles listed, and, upon information and belief, to disclose "all relevant information related to" each project that was "then available" to Warner—effectively preventing Sky from confirming whether these shows did or did not meet the requirements of the Co-Funding Agreement.  Forti acknowledged this and promised to follow up with complete contractual Submission Materials.

61.    On September 15, 2022, Sky held a call with Susanna Felleman, Executive Vice President for Business Affairs for HBO and Max ("Felleman"), to advise that Warner was again at risk of breaching its Co-Funding Agreement obligations for Year 2.  Felleman expressed doubt that Warner would comply with the requirement to present four qualifying Series to Sky before the end of Year 2.  As of the date of the parties' call, more than six months had passed since Warner had listed eight supposedly "Ordered Series" and no fewer than fifty-two additional titles purportedly in development for 2022 in the March 10 Drama Report.

62.    In the remaining months of Year 2, Warner failed to present four qualifying Series to Sky.

**Warner Fails to Present Four Qualifying Series in Year 3 (2023) and Newly Suggests That
Warner Will Not Meet Its Contractual Obligations Going Forward**

63.    In Year 3 of the Co-Funding Agreement (2023), Sky stood ready to consider and
select qualifying Series, but Warner yet again failed to present four qualifying Series to Sky.

64.    On February 3, 2023, Sky arranged a call with Felleman and Forti to convey
Sky's renewed concern at Warner's failure to submit four qualifying Series for Year 2 and to
request an update on the status of Warner's submissions for Year 3.  Felleman expressed doubts
that Warner would meet its contractual obligation to offer Sky at least four qualifying Series in
Year 3, or in any year during the term of the Co-Funding Agreement going forward, and instead
proposed that the parties agree to certain modifications to the contract.  While Sky agreed to
consider any proposals made by Warner, the parties did not reach agreement on any
modifications and no modifications were made to the Co-Funding Agreement.

65.    On February 10, 2023, Sky emailed Felleman and Forti in the spirit of
cooperation with conceptual "thoughts" on how modifications to the Co-Funding Agreement
potentially "could work."  Notably, these hypothetical modifications incorporated a number of
core features of the Co-Funding Agreement, such as (i) Sky's exclusive right to co-fund covered
Max projects (a "first look"); (ii) the requirement that Warner send Bi-Monthly Reports; and
(iii) similar terms for Sky's funding commitments, if Sky exercised its right to co-fund following
a "first look."

66.    On March 22, 2023, Forti responded with comments, specifically rejecting Sky's
concept that the existing funding terms would apply if Sky elected to co-fund a project following
a "first look."  Instead, Warner insisted that the parties would have to negotiate the terms of
Sky's funding commitment separately for each project.  In other words, Warner effectively
proposed that the Co-Funding Agreement be replaced with an unenforceable agreement to agree

on a project-by-project basis.  Sky could not and did not accept these terms, and the parties did

not otherwise agree to make any modifications to the Co-Funding Agreement.

67.     Warner failed to present any qualifying Series for the remainder of Year 3.

**While in Breach of Its Obligations to Sky, Warner Publicly Announces It Has**
**Ordered a Highly Valuable, Contractually Qualifying *Harry Potter* Series and**
**Unequivocally Repudiates the Co-Funding Agreement**

68.     On April 12, 2023—having failed to offer Sky even the minimum required

qualifying Series for nearly two and a half years—Warner suddenly announced the *Harry Potter*

Series to great public fanfare.

69.     Specifically, on that date, WBD issued a press release (the "April 12 Press

Release") stating in relevant part: "[HBO] Max is thrilled to announce it has ***ordered*** an original

'Harry Potter' scripted television series, it was confirmed today during Warner Bros. Discovery's

unveiling of the Max streaming service on the Warner Bros. lot in Los Angeles."  (emphasis

added).

70.     The April 12 Press Release went on to provide substantial details on the *Harry*

*Potter* Series.  For example, the announcement revealed that it would be a "decade-long series,"

that it would "faithful[ly] adapt[]" and "dive deep into each of the iconic books that fans have

continued to enjoy for all of these years," and that it would be produced "[f]rom Warner Bros.

Television" as a "Max Original Series" to premiere on Max in the U.S. and be available

"globally once produced."

71.     On the same day, J.K. Rowling, the author of the *Harry Potter* novels, announced

substantially similar details in a press release on her personal website, noting that the new series

would be "[p]roduced in association with Brontë Film and TV with [long-time Rowling

associates] Neil Blair and Ruth Kenley-Letts joining J.K. Rowling as Executive Producers."

72.    Also on April 12, 2023, Warner published a 40-second promotional video on YouTube entitled "Harry Potter Max Original Series | Official Announcement | Max."  The description included with the video states that "Max has ordered the first ever #HarryPotter scripted television series, a faithful adaptation of the iconic books.  #StreamOnMax."  As of September 26, 2024, this promotional video had been viewed approximately 2.8 million times on YouTube.

73.    Rowling's *Harry Potter* franchise is virtually without equal as a modern popular literature and entertainment media property.  Since publication of the first installment in 1998, the original series of seven novels has sold over six hundred million copies worldwide in at least eighty-five languages and been listened to in audiobook format for over one billion hours.  Each of the last four novels in the series consecutively set records as the fastest-selling books history, with the seventh and final installment selling roughly 2.7 million copies in the U.K. and 8.3 million copies in the U.S. within twenty-four hours of its release.  It has repeatedly been reported that only perhaps two to three books—among them, the Bible—have exceeded *Harry Potter* in total international book sales.

74.    The novels have spawned eight blockbuster feature-length movies (produced and distributed by Warner Bros. Pictures), which have collectively grossed at least $7.7 billion worldwide, ranking them among the handful of highest grossing film franchises of all time (alongside iconic film properties such *Star Wars*, *James Bond*, and *Spider-Man*), and vaulted previously unknown English actors such as Daniel Radcliffe and Emma Watson to "A-list" international stardom.  A stage production, *Harry Potter and the Cursed Child*, has been recognized as the most successful and highest-grossing non-musical play in Broadway history, with over $270 million in total sales and 2.5 million tickets sold, while its counterpart in

London's West End has been seen by at least 1.6 million patrons and is the most decorated production in the history of the Olivier Awards. The above-referenced *Hogwarts Legacy* was the bestselling video game release of 2023. A spin-off prequel series to the original films, *Fantastic Beasts*, has collectively grossed nearly $2 billion thus far.

75.     *Harry Potter* has further inspired clothing, toy, and novelty food and drink lines (among countless other merchandise streams); popular theme parks in Florida and California (operated by a division of Comcast subsidiary NBCUniversal); a studio tour in London (run by Warner Bros. Studios) that attracts more than 6,000 visitors a day; an internationally touring immersive exhibition currently showing in midtown Manhattan; and untold numbers of cultural homages, imitations, and other followings, such as live re-creations, interactive experiences, festivals, dedicated social media communities, and even leagues dedicated to the wizarding sport, "quidditch," first introduced in the novels.

76.     The *Harry Potter* brand has been estimated to be worth at least $25 billion altogether, and Rowling is generally recognized as the first billionaire to have attained that level of wealth exclusively through her writing. Vox and other media outlets have described *Harry Potter* as having "tremendously outsized cultural reach," and, indeed, even WBD's April 12 Press Release itself characterized *Harry Potter* as a "cultural phenomenon."

77.     Unsurprisingly, given the above, in the months since the official announcement that the *Harry Potter* Series had been ordered to a first season on Max, WBD executives have emphasized their excitement about the project and stressed that the *Harry Potter* Series is essential for Max's and WBD's success—particularly in international markets, including much or all of the Sky Territory. During comments on WBD's Q4 2023 earnings call, conducted February 23, 2024, WBD CEO David Zaslav ("Zaslav") stated that the "real strategic advantage"

of WBD as a company is "the strength and depth of [its] franchises" such as *Harry Potter*.

Zaslav specifically cited the *Harry Potter* Series and its then-expected premiere in 2026 in the

context of WBD's efforts to "build[] Max" into a "profitable" streaming service, especially in

"key international regions and markets" such as the U.K., Germany, and Italy, all of which fall

within the Sky Territory.  Zaslav further relayed that he had been "in London a few weeks ago

with Casey and Channing" (presumably, Casey Bloys (Chairman and CEO, HBO and Max

Content) ("Bloys") and Channing Dungey (Chairman and CEO, WBTV)), where they had "spent

some real time with JK and her team," and that "[b]oth sides are thrilled to be reigniting this

franchise," "couldn't be more excited about what's ahead," and "can't wait to share a decade of

new stories with the fans around the world on Max."  Aptly summarizing, Zaslav observed that

"we've not been shy about our excitement around Harry Potter."

78.    Moreover, Zaslav separately told investors that the *Harry Potter* franchise is

essential to the success of WBD's studio.  On September 6, 2023, Zaslav stated at the Goldman

Sachs Communacopia + Technology Conference that "[i]f you look at the performance over the

last 20 years of Warner Brothers, when you take those franchises out [*i.e.*, *Harry Potter*, DC

Comics Inc. films, and *Lord of the Rings*]," the profitability of WBD's studio is "*relatively flat*,"

but "[w]hen you put those franchises in, it's the best performing studio in the world."  (emphasis

added).  Zaslav specifically identified *Harry Potter* as "one of the big differentiators" for WBD's

studio.

79.    The *Harry Potter* Series is thus by any measure, including Warner's own, a

potentially transformational property for which there simply is no reasonable substitute.

80.    The *Harry Potter* Series also unquestionably meets the criteria for a qualifying

"Series" under the Co-Funding Agreement.  Per the April 12 Press Release, Rowling's

concurrent release, and the "Official Announcement" promotional video on YouTube, the *Harry Potter* Series was "ordered" in Year 3 of the Co-Funding Agreement (i.e., in April 2023); it will be a decade-long series; and it will be produced by WBTV as a "Max Original Series" for premiere on Max.

81.    As discussed, pursuant to Section 4(b) of the Co-Funding Agreement, "[a] Series *shall be formally submitted* to Sky UK executives (on behalf of Sky) for consideration *once HBO MAX is prepared to order a first season*" of the Series.  Since Warner had already "ordered" the *Harry Potter* Series as of the date of the April 12 Press Release, Warner was required to promptly make a formal submission of the *Harry Potter* Series to Sky.  However, Warner failed to promptly transmit *any* Submission Materials—let alone "all relevant information related to the Series"—that were "then available" to Warner.  Had Warner complied with its obligations and submitted the *Harry Potter* Series for Sky's consideration, Sky would have enthusiastically accepted it for co-funding and co-production.

82.    On May 11, 2023, Sky held a call with Felleman and Forti to discuss the delay in Warner's submission of the *Harry Potter* Series, as well as the overarching requirement under the Co-Funding Agreement that Warner present a minimum of four qualifying Series to Sky each calendar year.  On the call, Felleman inexplicably denied that the *Harry Potter* series had been "ordered," claimed that she was unaware of the April 12 Press Release, and argued for the first time that the Co-Funding Agreement was "not effective."  Felleman also specifically refused to formally submit the *Harry Potter* Series to Sky.

83.    On May 13, 2023, Felleman emailed Sky "to reiterate the facts about the status of the *Harry Potter* [S]eries, and [Warner's] position on the deal between [Warner] and Sky."  Felleman purported to repudiate Warner's obligations under the Co-Funding Agreement and

indicated that Warner would not offer Sky at least four qualifying Series per year going forward. Among other things, Felleman stated that "the deal as originally agreed [*i.e.*, the Co-Funding Agreement] *does not and cannot function*"; falsely asserted without explanation that Sky had "acknowledged on multiple occasions" that "*the actual circumstances of production preclude HBO Max from ever presenting Sky with four series in one year*"; and took the position that "*performance by HBO Max is impossible* and accordingly . . . the deal is unenforceable" and "inoperative."  (all emphasis added).[1]

84.     In her May 13 email, Felleman reiterated Warner's refusal to submit the *Harry Potter* Series to Sky.  Directly contradicting the April 12 Press Release, Felleman claimed that "the *Harry Potter* [S]eries is not greenlit, in spite of what you have read, and *it will not be for quite some time, if ever*."  (emphasis added).  Felleman further suggested that Warner could take steps apparently designed to evade the express terms of the Co-Funding Agreement, stating (again in contrast to the April 12 Press Release) that Warner had "not decided definitively whether the series will be for HBO Max or HBO, or whether it will be a co-production – another reason your request for submission is inappropriate."

85.     On May 23, 2023, Sky, sent a letter to Warner formally conveying Sky's position that Warner was, and remains, in material breach of its obligations under the Co-Funding Agreement.  The letter requested that Warner confirm by no later than May 29, 2023 (i) that Warner would in fact comply with the Co-Funding Agreement and (ii) confirm when Warner would make a formal submission of the *Harry Potter* series to Sky for consideration.

---

[1] Subsequently, in the spring of 2024, Warner offered to Sky—and Sky agreed to co-fund—a single qualifying Series entitled *The Pitt*.  Warner's offer further confirms that the Co-Funding Agreement is a valid, enforceable contract.  Nevertheless, Warner did not purport to retract its prior repudiation in connection with the offer or otherwise indicate that it intended to submit at least four qualifying Series per year in 2024 or any other remaining contract year.

86.     Warner responded principally by letter dated June 7, 2023.  Among other things, Warner falsely contended that "there [was] no qualifying Harry Potter [S]eries yet," including because the project was "only in the infancy of development and . . . a long way from being greenlit"; that "Harry Potter may never become a qualifying Series"; and "so Warner [could] not predict at this time if and when a Harry Potter series might be formally submitted to Sky."

87.     In more than a year since Warner's letter, and as of the date of this filing, Warner has continued to refuse to submit the *Harry Potter* Series for Sky's consideration in accordance with the terms of the Co-Funding Agreement.

88.     The positions articulated in Warner's May and June 2023 correspondence were false and misleading; they were also at odds with public announcements and reporting about development of the *Harry Potter* Series at that time and have been repeatedly contradicted by subsequent public statements from WBD or Warner announcing further details of the *Harry Potter* Series to investors.  Among other things, the April 12 Press Release and Rowling's concurrent release together identified three actual and one potential (since confirmed) executive producers for the *Harry Potter* Series; and it was widely reported in the press in and around February 2024 that Warner previously "invited a select group of creatives" to pitch ideas for the Series in a process involving Rowling, with finalists for the job identified as *Succession* writer and consulting producer Francesca Gardiner ("Gardiner"), *Teenage Bounty Hunters* creator Kathleen Jordan, and *The Devil's Hour* creator Tom Moran.  Subsequently, on June 26, 2024, WBD announced that the Emmy-winning Gardiner would indeed serve as the *Harry Potter* Series' showrunner and executive producer, while Mark Mylod—another Emmy-winning veteran of *Succession* as well as other blockbuster shows such as *Game of Thrones*, *The Last of Us*, and *Entourage*—would direct multiple episodes and serve as another executive producer.

On the same day as this announcement, *Variety* reported that "casting [was] . . . believed to be the next order of business."  In July 2024, *The Times of London* reported that the budget for the *Harry Potter* Series would exceed $200 million per season, making it one of the most expensive television shows ever made.  And, most recently, multiple press outlets reported in early September 2024 that Warner had officially launched a casting call for the three lead acting roles in the *Harry Potter* Series, with *Deadline* noting a potential target production start date in April 2025.

89.    As a public company that would undoubtedly want to avoid exposing itself to liability under the U.S. securities laws and other legal provisions for misleading investors or regulators, WBD is presumably being candid in the press even as it tells a different story privately to Sky.  Such double-talk allows Warner to leverage updates on the *Harry Potter* Series' development to excite investors while trying to avoid any obligation to share its value under the Co-Funding Agreement.

90.    Notwithstanding the Co-Funding Agreement's clear requirement that Warner provide Sky with all then-available Submission Materials—defined to include, among other things, the "key creative elements" such as the "writer(s)" as well as the identity of the "producer(s)"—Warner has not presented any of the above information (or any other aspect of the Submission Materials for the *Harry Potter* Series) to Sky.  Rather, in each instance, Sky has learned of these key details after the fact through press releases, new articles, or statements by WBD executives to investors.

91.    Warner's reason for refusing to honor its obligations to Sky could not be more clear: Warner has chosen to keep the *Harry Potter* Series for itself and make the blockbuster Series the cornerstone of its own Max rollout in Europe.  Warner publicly announced in March

2024 that the Max rollout to Europe would begin in May 2024, "bring[ing] a new streaming experience" to at least twenty-five initial countries that would "stand[] out as distinct" by, among other things, delivering "iconic franchises."  And, as *Deadline* and other outlets reported at the time, the *Harry Potter* Series "will, of course be on Max once the series is ready."

92.    If there were any remaining doubt about WBD's intentions, it was dispelled by comments from Gerhard Zeiler, WBD's President of International, at the MoffettNathanson Technology, Media, and Telecom Conference in New York on May 15, 2024.  Explaining WBD's ongoing efforts to, as described by *Deadline*, "turbocharg[e]" Max's "international expansion," Zeiler remarked that, while Sky remains a "great partner," WBD does not want to "disadvantage" itself by not being able to distribute the highly-rated "Warner Bros. and . . . HBO content which we sell to Sky" through its own streaming service.  As *Deadline* aptly put it, Max "wants a beachhead in the U.K., Germany, Italy (and other markets) and needs HBO and Warner Bros. programming."

93.    As discussed above, this design to allocate WBD's best and most desirable content to Max in Sky's markets is exactly what the Co-Funding Agreement was intended to prevent.

**Facing Litigation, WBD Suddenly Rebrands the *Harry Potter* Series as an HBO Show**

94.    In late June 2024, *Variety* reported an abrupt decision by Bloys to "mov[e] most of Max's upcoming big-budget, tentpole Warner Bros. IP projects to under the HBO umbrella," meaning that "the upcoming 'Harry Potter' TV show," along with "other big-budget titles," would "all now be branded as HBO originals"—a "switch from the most recent decision to place all series based on Warner Bros. IP in the Max bucket."  Bloys characterized the move, which would take effect with shows launching in 2025, as intended to remove a "delineation" between

Max and HBO shows that he himself had overseen four year earlier as now suddenly "unnecessary" and even disadvantageous to WBD from a "label[ing]" perspective as "Max started developing series that are more in the broadcast/traditional TV vein" with correspondingly larger production budgets.  As part of the "realignment," shows like the *Harry Potter* Series that would now "be branded for HBO" and would be "guaranteed to run on the linear network in addition to Max," thereby "guarantee[ing] a larger volume of programming for the network in 2025."

95.    The move to rebrand the *Harry Potter* Series—announced *after* Sky made clear to Warner that it was considering litigation to address Warner's breaches of the Co-Funding Agreement—has no effect on Sky's entitlement to the *Harry Potter* Series, which, as discussed above, was announced as "ordered" by "HBO Max" in 2023 and in all events will, according to *Variety*, "[o]f course . . . still stream on Max."  (Indeed, *Variety* deemed Warner's step a mere "tweak in branding" that would "likely go unnoticed among most consumers.")  But any effort on the part of Warner to claim that Bloys' recent decision to brand the *Harry Potter* Series (or any other qualifying Series) as HBO content and air it on the linear channel somehow removes it from the ambit of the Co-Funding Agreement would be a transparent attempt to avoid its contractual obligations and improperly deprive Sky of the contractual benefits for which it bargained.

96.    Through the instant action, Sky asks the Court to stop Warner—however its gambit may be styled—from despoiling the fruits of the Co-Funding Agreement to which Sky is entitled.  Sky bargained for the right to co-fund and co-produce at least four Series per year over the contractual term.  Warner has deprived Sky of those rights, including its contractual entitlement to partner with Warner on the upcoming *Harry Potter* Series.  Sky has sought to

engage with Warner in the hope of reaching an amicable and mutually acceptable commercial

resolution.  It is now clear, however, that judicial intervention is necessary to rectify Warner's

repeated breaches, and Sky respectfully requests the relief set out below.

## CAUSES OF ACTION

### COUNT I
### (Breach of Contract)

97.    Sky incorporates by reference the preceding allegations as if fully set forth herein.

98.    The Co-Funding Agreement is a valid, enforceable contract between Sky and

Warner.

99.    Warner has materially breached its obligations under the Co-Funding Agreement

by: failing to submit at least four qualifying Series for Sky's consideration during each of the

years 2021, 2022, and 2023; failing to timely provide "all relevant information" that was "then

available" to Warner regarding any and all potentially qualifying Series during that timeframe;

and failing to submit the *Harry Potter* Series for Sky's consideration in accordance with the

contractual terms at any time since Warner publicly announced that it had "ordered" the show on

April 12, 2023.

100.    Sky has performed, or has stood fully prepared to perform, all of its obligations

under the Co-Funding Agreement.  Among other things, Sky has accepted for co-funding the

only qualifying Series offered to it in 2024 thus far, as discussed above.

101.    Sky has sustained damages as a direct and proximate result of Warner's breaches

of the Co-Funding Agreement in an amount to be determined at trial.  Among other things, it has

suffered, or will imminently suffer, no less than hundreds of millions of dollars' worth of lost

revenue that it otherwise would have generated from exploitation of the Sky Rights associated

with Selected Series.

102.     Sky has also suffered, or will imminently suffer, injury in the form of reputational harm, loss of brand equity, damage to subscriber and potential subscriber goodwill, and reduced competitive standing in the market due to Warner's deprivation of Sky's opportunity to co-finance, co-produce, help develop, and exclusively exploit the Sky Rights associated with the *Harry Potter* Series—a wholly unique property without reasonable comparators or substitutes. Such injury is neither reasonably quantifiable nor fully compensable with money damages.

## COUNT II
### (Anticipatory Repudiation of Contract)

103.     Sky incorporates by reference the preceding allegations as if fully set forth herein.

104.     The Co-Funding Agreement is a valid, enforceable contract between Sky and Warner.  The term of the Co-Funding Agreement runs through December 31, 2025.

105.     Warner has expressly denied that the Co-Funding Agreement is a binding and enforceable contract and has positively, definitively, and unequivocally stated, demonstrated, and given final notice that it will not perform remaining material obligations under the Co-Funding Agreement, including its obligation to submit at least four qualifying Series for Sky's consideration during 2024 and 2025 and its obligation to submit the *Harry Potter* Series for Sky's consideration in accordance with the contractual terms at any time before the show's expected premier.

106.     Sky has performed, or has stood fully prepared to perform, all of its obligations under the Co-Funding Agreement to date and is fully prepared to perform all such obligations through the end of the contractual term.

107.     Sky has sustained, or imminently will sustain, damages as a direct and proximate result of Warner's repudiation of the Co-Funding Agreement in an amount to be determined at trial.  Among other things, it has suffered, or will imminently suffer, no less than hundreds of

millions of dollars' worth of lost revenue that it otherwise would have generated from exploitation of the Sky Rights associated with Selected Series.

108.    Sky has also suffered, or will imminently suffer, injury in the form of reputational harm, loss of brand equity, damage to subscriber and potential subscriber goodwill, and reduced competitive standing in the market due to Warner's deprivation of Sky's opportunity to co-finance, co-produce, help develop, and exclusively exploit the Sky Rights associated with the *Harry Potter* Series—a wholly unique property without reasonable comparators or substitutes. Such injury is neither reasonably quantifiable nor fully compensable with money damages.

**COUNT III (in the alternative)**
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

109.    Sky incorporates by reference the preceding allegations as if fully set forth herein.

110.    The Co-Funding Agreement is a valid, enforceable contract between Sky and Warner.

111.    Sky has performed, or has stood fully prepared to perform, all of its obligations under the Co-Funding Agreement to date and is fully prepared to perform all such obligations through the end of the contractual term.

112.    Warner has a duty to act fairly and in good faith and not do anything that would have the effect of interfering with or injuring the rights of Sky to receive the benefits of the Co-Funding Agreement.

113.    In the alternative to Counts I and/or II, Warner has breached the implied covenant of good faith and fair dealing to the extent it has attempted, or attempts, to circumvent its obligations under the Co-Funding Agreement and deprive Sky of bargained-for opportunities to co-fund qualifying Series (including the *Harry Potter* Series) by diverting Series that would otherwise air on Max to an HBO linear channel.

114.    Sky has sustained damages as a direct and proximate result of Warner's breaches in an amount to be determined at trial.  Among other things, it has suffered, or will imminently suffer, no less than hundreds of millions of dollars' worth of lost revenue that it otherwise would have generated from exploitation of the Sky Rights associated with Selected Series.

115.    Sky has also suffered, or will imminently suffer, injury in the form of reputational harm, loss of brand equity, damage to subscriber and potential subscriber goodwill, and reduced competitive standing in the market due to Warner's deprivation of Sky's opportunity to co-finance, co-produce, help develop, and exclusively exploit the Sky Rights associated with the *Harry Potter* Series—a wholly unique property without reasonable comparators or substitutes. Such injury is neither reasonably quantifiable nor fully compensable with money damages.

## PRAYER FOR RELIEF

WHEREFORE, Sky respectfully request that the Court enter judgment in its favor prays for:

a)    A judgment and declaration that Defendant Warner has breached its obligations under and/or anticipatorily repudiated the Co-Funding Agreement;

b)    An order awarding compensatory and consequential damages to Plaintiff Sky in an amount to be proven at trial;

c)    An order requiring Defendant Warner to immediately submit the *Harry Potter* Series for Plaintiff Sky's consideration in accordance with the terms of the Co-Funding Agreement;

d)    An award to Plaintiff Sky of its costs, attorneys' fees, and reasonable expenses of litigation to the fullest extent permitted by law;

e)    An order awarding pre-judgment and post-judgment interest to Plaintiff Sky; and

f)     Such further equitable or other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Sky demands trial by jury in this action of all issues so triable.

Respectfully submitted,

Dated:  September 27, 2024
        New York, New York

DAVIS POLK & WARDWELL LLP
By: */s/ Paul Spagnoletti*
Paul Spagnoletti
Craig J. Bergman
Luca Marzorati
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
paul.spagnoletti@davispolk.com
craig.bergman@davispolk.com
luca.marzorati@davispolk.com

HERBERT SMITH FREEHILLS NEW YORK LLP
Scott S. Balber
Christopher Boyd
450 Lexington Ave, 14th Floor
New York, New York 10017
Telephone: (917) 542-7801
Facsimile: (917) 542-7601
Scott.Balber@hsf.com
Christopher.Boyd@hsf.com

*Attorneys for Plaintiffs Sky UK Ltd., Sky Italia S.r.l., and Sky Deutschland Fernsehen GmbH & Co. KG*